IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KHAMMAY KEOMANIVONG,

           Petitioner,

      vs.

FRANCISCO JACQUEZ,[1] Warden (A),
Pelican Bay State Prison,

           Respondent.

No. 2:07-cv-02409-JWS

MEMORANDUM DECISION

Petitioner Khammay Keomanivong, a state prisoner appearing *pro se*, has filed a petition for habeas corpus relief under 28 U.S.C. § 2254.  Keomanivong is currently in the custody of the California Department of Corrections and Rehabilitation, incarcerated at the Pelican Bay State Prison.  Respondent has answered, and Keomanivong has replied.

## I.  BACKGROUND/PRIOR PROCEEDING

Following a jury trial, Keomanivong, along with two co-defendants, Hong Le and Manora Ek, were found guilty in the San Joaquin County Superior Court of first-degree murder (Cal. Penal Code § 187), with two special circumstances, discharging a firearm from a motor vehicle with the intent to inflict death (Cal. Penal Code § 190.2(a)(21)), being an active participant in a criminal street gang and carrying out the murder to further the activities of the gang (Cal. Penal Code § 190.2(a)(22)), and six counts of attempted murder (Cal. Penal Code §§ 187, 664) against six identified ASW members.  As to all of these counts, the jury found two

---

[1] Francisco Jacquez, Warden (A), Pelican Bay State Prison, is substituted for Robert A. Horel, Warden, Pelican Bay State Prison.  Fed. R. Civ. P. 25(d).

firearm enhancements (Cal. Penal Code § 12022.53(c) and (d)), and a gang enhancement (Cal.

Penal Code § 186.22(b)(1).  All defendants were also convicted of discharging a firearm from a

motor vehicle (Cal. Penal Code § 12034(c)), with gun use (Cal. Penal Code § 12022.53(d)) and

gang (Cal. Penal Code § 186.22(b)(1)) enhancements, and street terrorism (Cal. Penal Code

§ 186.22(a)).  In addition, Keomanivong was convicted of possession of a firearm by a felon

(Cal. Penal Code § 12021(a)).  The trial court sentenced Keomanivong to two prison terms of

life without possibility of parole.

All three defendants timely appealed their convictions and sentences to the California

Court of Appeal, Third District.  As to defendants Keomanivong and Ek, the Court of Appeal

found errors in sentencing and modified the sentences accordingly,[2] and reversed Le's conviction

in an unpublished reasoned decision.[3]  The California Supreme Court summarily denied review

in a "postcard denial" without opinion or citation to authority on February 7, 2007.

Keomanivong did not seek collateral review in the California state courts.  Keomanivong timely

filed his petition for relief in this court on November 5, 2007, and his second amended petition

with leave of court on June 23, 2009.

## II.  GROUNDS RAISED/DEFENSES

In his second amended petition, Keomanivong raises seven grounds for relief: (1)  denial

of a speedy trial; (2) the prosecution failed to disclose evidence favorable to defendant; (3) an

improper jury instruction on self-defense; (4) the trial court improperly refused to discharge a

juror; (5) ineffective assistance of trial counsel; (6) a *Kurtzman* error;[4] and (7) insufficient

---

[2] One of the life without possibility of parole sentences was vacated.

[3] *People v. Le*, 2006 WL 2949021 (Cal. App. October 16, 2006).

[4] *People v. Kurtzman*, 758 P.2d 572 (Cal. 1988).

evidence to support a gang member enhancement.  Keomanivong also adds as his eighth ground joinder in the arguments of his co-appellants Le and Ek.  Out of an abundance of caution, the court will also consider the grounds raised by co-defendant Manora Ek in his separate petition for habeas corpus relief that have not been specifically raised by Keomanivong.[5]  Those grounds are:[6]  (8) restrictions on the jury selection *voir dire*; and (9) prosecutorial misconduct in misstating the standard of proof in closing argument.  Respondent contends that Keomanivong has not properly exhausted his state court remedies with respect to his third, fourth, sixth, and seventh grounds and that his third ground is procedurally barred.  Respondent further contends that, with respect to the attempt to join the grounds raised by Keomanivong's co-defendant, Ek, the Court should not consider those claims because they are neither identified nor has Keomanivong attached a copy of the referenced briefs.[7]  Respondent raises no other affirmative defense.[8]

---

[5] *Ek v. Felker*, 2:08-cv-00962-JWS, decided this date in a separate decision.

[6] For continuity, the court does not adopt the numbering in the *Ek* case but continues the sequential numbering in this case, starting with the next number, 8.  In addition, the court does not consider as properly adopted the ground raised by Ek concerning CALJIC No. 5.55.  Although Ek raised that issue on direct appeal, Keomanivong did not.  Consequently, as to Keomanivong, that ground is unexhausted.  In any event, the court would deny Keomanivong relief under that ground for the same reasons relief is being denied to Ek.

[7] The court notes, however, that in his answer filed June 29, 2009, at Docket No. 26, Respondent specifically requested the petition in this case be consolidated with the *Ek* case.  Thus, Respondent cannot claim any prejudice by the court's consideration of those grounds in this case as well as in *Ek*.

[8] *See* Rules—Section 2254 Cases, Rule 5(b).

### III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States" at the time the state court renders its decision or "was based

on an unreasonable determination of the facts in light of the evidence presented in the State court

proceeding."[9]  The Supreme Court has explained that "clearly established Federal law" in

§ 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the

time of the relevant state-court decision."[10]  The holding must also be intended to be binding

upon the states; that is, the decision must be based upon constitutional grounds, not on the

supervisory power of the Supreme Court over federal courts.[11]  Thus, where holdings of the

Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said

that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"[12]  When a claim

falls under the "unreasonable application" prong, a state court's application of Supreme Court

precedent must be objectively unreasonable, not just incorrect or erroneous.[13]  The Supreme

---

[9] 28 U.S.C. § 2254(d); *see Williams v. Taylor*, 529 U.S. 362, 404-06 (2000); *see also Lockyer v. Andrade,* 538 U.S. 63, 70-75 (2003) (explaining this standard).

[10] *Williams*, 529 U.S. at 412.

[11] *Early v. Packer*, 537 U.S. 3, 10 (2002).

[12] *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (alterations by the Court); *see Wright v. Van Patten*, 552 U.S. 120, 127 (2008) (per curiam); *Kessee v. Mendoza-Powers*, 574 F.3d 675, 678-79 (9th Cir. 2009); *Moses v. Payne*, 555 F.3d 742, 753–54 (9th Cir. 2009) (explaining the difference between principles enunciated by the Supreme Court that are directly applicable to the case and principles that must be modified in order to be applied to the case; the former are clearly established precedent for purposes of § 2254(d)(1), the latter are not).

[13] *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal quotation marks and citations omitted).

Court has made clear that the objectively unreasonable standard is a substantially higher threshold than simply believing that the state court determination was incorrect.[14]  "[A]bsent a specific constitutional violation, federal habeas corpus review of trial error is limited to whether the error 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[15]  In a federal habeas proceeding, the standard under which this court must assess the prejudicial impact of constitutional error in a state-court criminal trial is whether the error had a substantial and injurious effect or influence in determining the outcome.[16]  Because state court judgments of conviction and sentence carry a presumption of finality and legality, the petitioner has the burden of showing by a preponderance of the evidence that he or she merits habeas relief.[17]

In applying this standard, this court reviews the last reasoned decision by the state court,[18] which in this case was that of the California Court of Appeal.  Under AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption

---

[14] *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).

[15] *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

[16] *Fry v. Pliler*, 551 U.S. 112, 121 (2007) (adopting the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 637–38 (1993)).

[17] *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002); *see Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (per curiam) (stating that a federal court cannot grant "habeas relief on the basis of little more than speculation with slight support").

[18] *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991); *Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004).

by clear and convincing evidence.[19]  This presumption applies to state trial courts and appellate

courts alike.[20]

## IV.  DISCUSSION

**A.  Grounds Raised Directly by Keomanivong**.

Ground 1:  Speedy Trial.

Keomanivong contends that because he withdrew his waiver of time on October 3, 2002,

and was not brought to trial until July 2003, he was denied his right to a speedy trial.  The

California Court of Appeal recited the factual background in its opinion.

> Keomanivong was arrested on March 19, 2002, and held in custody since that
> time.  On July 16, 2002, after the preliminary hearing, he was held to answer on
> the charges.  The information was filed on July 29, 2002, and Keomanivong was
> arraigned the next day.  Keomanivong brought a motion to set aside the
> information under Penal Code section 995; he waived time so his motion could be
> heard. On October 3, 2002, the motion was resolved and Keomanivong withdrew
> his time waiver.
>
> At a hearing on October 28, 2002, Le and Keomanivong put on the record that
> they withdrew their time waivers on October 3 and trial for them must be set by
> early December. The district attorney and counsel for Inthirath and Oth (who
> were still in the case at that time) had schedule conflicts.  The court indicated it
> would decide the severance motions, based on *Aranda-Bruton* issues (*Bruton v.
> United States* (1968) 391 U.S. 128 [20 L.Ed.2d 476]; *People v. Aranda* (1965) 63
> Cal.2d 518) in the various statements of defendants, before setting the case for
> trial.
> At the hearing on the motion to sever, November 5, 2002, counsel for Le and
> Keomanivong argued the severance motion was moot because three defendants
> (Le, Keomanivong and Chhun) had withdrawn their time waivers.  The court
> indicated it could not decide the severance issue at that time because it had just
> got the redacted statements.  The prosecutor indicated that if trial was set for any
> of defendants' cases, the People would not waive time as to any of the defendants.
> He further stated he did not understand how they could be ready for trial in less
> than 30 days.

---

[19] 28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[20] *Stevenson v. Lewis*, 384 F.3d 1069, 1072 (9th Cir. 2004).

Counsel for Keomanivong made it clear he wanted the trial set by December 3.
Although that was less than 30 days away and he had not received witness
information from the prosecutor, he would not complain.  The prosecutor stated
that once a trial date was set, if any counsel made a motion to continue, under
Penal Code section 1050.1 there would be justification to continue all the
cases.FN9  He argued a defendant could not get severance simply by not waiving
time.  Counsel for Keomanivong noted the time waivers were withdrawn before
any motions to sever had been filed, or even prepared.

> FN9. At a much earlier hearing, on April 15, 2002, none of the parties
> disagreed with the proposition that good cause to continue the trial of one
> defendant was good cause to continue the trial of all.

After a discussion of which defendants wanted their trial severed from which
other defendants, the prosecutor stated it was critical to the People's case to have
only one trial.  There were significant transportation issues with the witnesses
from Oakland.  There were also concerns about threats to witnesses.  He
explained that getting all the witnesses to court once would be a feat, but getting
them there multiple times would be next to impossible.  If defendants would not
waive time, the People would not.  A trial date should be set for all six cases; if
any defendant moved to continue his case, the People would move to continue all
the cases under Penal Code section 1050.1.

The trial court agreed that was the only way to handle the situation and set the
trial date for November 25, 2002.

At the next hearing on November 11, 2002, the court announced that counsel for
Le had passed away.  Keomanivong wanted to go to trial; he would not waive
time.  The court found good cause to continue the case and vacated the trial date
as to all defendants.  Keomanivong put his objection on the record.  By early
December Le had retained new counsel.  That counsel indicated he could be ready
for trial in May.  Keomanivong maintained his desire for the earliest possible trial
date. In light of the request for a May trial date, the prosecutor raised
Keomanivong's speedy trial rights.  Le's new counsel and the prosecutor agreed
on April 1 for the trial date.  The trial court set the trial date as April 1, 2003, over
Keomanivong's express objection.

In January 2003, the motions to sever were denied; the court ruled the cases
would proceed in a joint trial with the agreed upon redactions to defendants'
statements. Keomanivong again raised the issue of his right to a speedy trial; he
had not waived time.  Counsel for Inthirath and Ek indicated they could not start
the trial in April because they had a death penalty case scheduled then.  In
addition, counsel for Inthirath was expecting her first grandchild at the end of
June and her son-in-law was being deployed to the Middle East in mid-April.

The trial court set the trial date as July 1, 2003.  Counsel for Keomanivong questioned whether other counsels' schedules was good cause for continuing his client's trial.  The court responded yes; good cause for one was good cause for all.  Counsel indicated Keomanivong was very upset and wanted the finding of the good cause stated on the record.  The court found good cause to continue the case until June 30 due to the unavailability of counsel.  Keomanivong placed his objection based on his right to a speedy trial on the record.  The court noted the Legislature had set the 60-day trial limit.  "What the Legislature giveth, the Legislature can taketh away."  The court believed the Legislature had taken away the right to a trial within 60 days.  The court encouraged Keomanivong to take a writ to settle the issue.

After further continuances, jury selection began July 10, 2003.[21]

The Court of Appeal rejected Keomanivong's position, holding:[22]

Even before the enactment of Penal Code section 1050.1, courts have found the need to maintain joinder in a complex case could constitute good cause to continue a trial beyond the 60-day period.  In *Ferenz v. Superior Court* (1942) 53 Cal.App.2d 639 (*Ferenz*), this court found good cause to continue defendant's trial beyond 60 days over his objection.  The prosecution presented affidavits in support of the continuance showing that nine defendants were jointly charged in a conspiracy to violate sedition laws.  It was desirable and necessary to try them together because the trial required 50 witnesses, several from out-of-town, and would take eight to ten weeks.  (*Id.* at p. 641.)  This court found the prosecution had shown good cause for the continuance.  (*Id.* at p. 643.)

In *Hollis v. Superior Court* (1985) 165 Cal.App.3d 642, four defendants were charged with murder.  Three defendants moved for a continuance, on the basis counsel needed more time to prepare for trial, and they waived time.  Defendant did not; he demanded trial as originally scheduled and sought to dismiss the information as to him when his trial was continued.  (*Id.* at p. 644.)  This court found the trial court did not abuse its discretion in continuing the trial; it properly balanced the competing interests in joint trial and speedy trial in a substantial and complex case.  (*Id.* at p. 646.)  "Where a continuance is granted to a codefendant upon good cause, the rights of other jointly charged defendants are generally deemed not to have been prejudiced."  (*Ibid.,* citing *People v. Teale* (1965) 63 Cal.2d 178, 186.)

---

[21] *Le*, 2006 WL 2949021 at *16-18.

[22] As the sole issue before this court is whether Keomanivong's constitutional speedy trial rights were violated, in the interests of brevity, the court omitted the Court of Appeal's exhaustive and thorough discussion of Keomanivong's speedy trial rights under the California state law.

In *Greenberger v. Superior Court* (1990) 219 Cal.App.3d 487, at page 501, the court also found good cause to continue a trial over defendant's objection to maintain joinder.  Thus, it is well established that maintaining joinder will, in the appropriate case, constitute good cause for a continuance.  This principle has now been codified in Penal Code section 1050.1.  This case was long and complex; the trial took eight weeks and over 40 witnesses were called.  As in *Ferenz, supra,* 53 Cal.App.2d 639, the length and complexity of the case, and the number of and the difficulty in securing attendance at trial of the witnesses provided good cause to maintain joinder and continue Keomanivong's case.

In *Greenberger v. Superior Court, supra,* 219 Cal.App.3d 487, because the delay was six months, substantially longer than in *Ferenz* (22 days) or *Hollis* (40 days), the court considered whether there was good cause for the long delay.  Relying on the factors set forth in *Barker v. Wingo* (1972) 407 U.S. 514 [33 L.Ed.2d 101], the court found there was.  (*Greenberger, supra,* at pp. 502-506.)  Here, it was about nine months from when Keomanivong withdrew his time waiver in October 2002 until jury selection began in July 2003.  Keomanivong contends the *Barker* factors show his Sixth Amendment speedy trial rights were infringed.

In *Barker v. Wingo, supra,* 407 U.S. 514, 516 [33 L.Ed.2d 101, 109], the United States Supreme Court undertook to set out the criteria by which the right to a speedy trial is to be judged.  The court rejected rigid approaches of a fixed time period or a demand-waiver rule in favor of a more flexible balancing approach, in which the conduct of both the prosecution and the defendant are weighed.  (*Id.* at pp. 529-530 [33 L.Ed.2d at p. 116].)  The court identified four factors to be applied on an ad hoc basis:  "Length of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."  (*Id.* at p. 530, fn. omitted [33 L.Ed.2d at p. 117].)  None of these factors is a necessary or sufficient condition to finding deprivation of the right to a speedy trial.  They are related factors which must be considered with other relevant circumstances in a "difficult and sensitive balancing process.  (*Id.* at p. 533 [33 L.Ed.2d at p. 118].)

The first factor, length of delay, serves as a triggering mechanism; until there is a delay that is presumptively prejudicial, there is no need to consider the other factors. (*Barker v. Wingo, supra,* 407 U.S. at p. 530 [33 L.Ed.2d at p. 117].) Depending on the nature of the charges, generally a postaccusation delay is considered "presumptively prejudicial" when it approaches one year.  (*Doggett v. United States* (1992) 505 U.S. 647, 652, fn. 1 [120 L.Ed.2d 520, 528].)  Here, it was almost a year between Keomanivong's arraignment on the information and his trial, so the delay triggers further inquiry. (*Barker v. Wingo, supra,* 407 U.S. at p. 530 [33 L.Ed.2d at p. 117].)

The second factor is the reason for the delay and different weights are assigned for different reasons.  "A deliberate attempt to delay the trial in order to hamper

the defense should be weighted heavily against the government.  A more neutral reason such as negligence or overcrowded courts should be weighed less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.  Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay." (*Barker v. Wingo, supra,* 407 U.S. at p. 531, fn. omitted [33 L.Ed.2d at p. 117].)

The delay until October 2002 should not be weighted against the People since Keomanivong waived time until this point.  As the Supreme Court noted, delay may often work to the accused's advantage. (*Barker v. Wingo, supra,* 407 U.S. at p. 521 [33 L.Ed.2d at p. 111].)  Keomanivong contends the primary reason for the delay after arraignment was that the prosecution failed to provide discovery.  Whatever the reason, Keomanivong expressly waived his speedy trial rights before October 2003 and cannot now complain about that delay.  From October 2003 on, the record, as set forth above, shows that the delay was to accommodate other counsel's schedules and to bring in new counsel after the death of Le's counsel.  This delay was necessary to maintain joinder, which was a valid reason.

The third factor is defendant's responsibility to assert his right to a speedy trial.  From October 2002, Keomanivong repeatedly asserted his right (although he did not move to dismiss the information), so this factor weighs in his favor. (*Barker v. Wingo, supra,* 407 U.S. at p. 531-532 [33 L.Ed.2d at p. 117].)

The final factor is prejudice to the defendant.  Prejudice should be assessed in light of the interests of the defendant which the speedy trial right was designed to protect: "(I) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." (*Barker v. Wingo, supra,* 407 U.S. at p. 532 [33 L.Ed.2d at p. 118].)  The last interest is the most serious. (*Ibid.*)

While Keomanivong suffered considerable pretrial incarceration and presumably the attendant anxiety and concern, there is no showing that the delay impaired his defense.  No witnesses on his behalf died or disappeared; there was no apparent loss of memory. (*Barker v. Wingo, supra,* 407 U.S. at p. 532 [33 L.Ed.2d at p. 118].)  Indeed, Keomanivong did not call any witnesses.  Nonetheless, he contends he was prejudiced by the delay because if his trial had been held earlier: (1) he would have taken the stand in his defense; FN10 (2) he would have been tried with Inthirath who may have testified Keomanivong was not a shooter or a promoter of the jump out; (3) he would have been able to impeach K.O., the only witness who testified he was a shooter, more effectively because her dislike of him was stronger then; and (4) an eyewitness, with fresher recollection, may have recalled that Keomanivong did not shoot.

---

FN10.  He contends the reason he did not take the stand was due to prosecutorial misconduct as set forth in part II. A. 2 of the Discussion.

---

Keomanivong's showing of prejudice is, at best, extremely speculative; it is based on things that *might* have happened.  We recognize that in *Doggett,* the Supreme Court allowed a presumption of prejudice based primarily on speculation. (*Doggett v. United States, supra,* 505 U.S. at pp. 657-658 [120 L.Ed.2d at pp. 531-532].)  In that case, however, the delay was egregious, over eight and a half years from indictment to trial, with six years attributable to the government's negligence.  And the government was unable to show the extensive delay did not impair defendant's ability to defend himself.  (*Id.* at p. 658 & fn. 4 [120 L.Ed.2d at p. 532].)

This case is distinguishable from *Doggett.*  The delay from after Keomanivong withdrew his time waiver was nine months, which is not quite the period-approaching one year-that is presumptively prejudicial. (*Doggett v. United States, supra,* 505 U.S. at p. 652, fn. 1 [120 L.Ed.2d at p. 528].)  More importantly, the reason for the delay is weighted less heavily against the government.  The primary reason for the delay was valid: to maintain joinder in a large, complicated case with many witnesses, several of whom came from out-of-town and posed transportation problems.  On balance, we find Keomanivong was not deprived of his right to a speedy trial.[23]

As the California Court of Appeal correctly noted, the seminal constitutional speedy trial case is *Barker,*[24] which is "clearly established law" under AEDPA.  As the Supreme Court recently noted in applying *Barker*:

> The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy ... trial."  The speedy-trial right is "amorphous," "slippery," and "necessarily relative."  *Barker,* 407 U.S., at 522, 92 S.Ct. 2182 (quoting *Beavers v. Haubert,* 198 U.S. 77, 87, 25 S.Ct. 573, 49 L.Ed. 950 (1905)).  It is "consistent with delays and depend[ent] upon circumstances."  407 U.S., at 522, 92 S.Ct. 2182 (internal quotation marks omitted).  In *Barker,* the Court refused to "quantif[y]" the right "into a specified number of days or months" or to hinge the right on a defendant's explicit request for a speedy trial.  *Id.,* at 522-525, 92 S.Ct. 2182.  Rejecting such "inflexible approaches," *Barker* established a "balancing test, in which the conduct of both the prosecution and the defendant are weighed."  *Id.,* at 529, 530, 92 S.Ct. 2182.  "[S]ome of the factors"

---

[23] *Le*, 2006 WL 2949021 at 19-22.

[24] *Barker v. Wingo*, 407 U.S. 514 (1972).

that courts should weigh include "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." *Ibid.*[25]

The *sine qua non* of a Sixth Amendment speedy trial violation is a showing of prejudice, *i.e.*, that the defendant's ability to present a defense is prejudiced by the delay.[26]  The mere fact of delay, standing alone, does not necessarily establish prejudice.[27]  As the Supreme Court has explained, to trigger a speedy trial analysis under *Barker*, an accused must allege the interval between accusation and trial has crossed the threshold dividing ordinary from "presumptively prejudicial" delay;[28] that is, the point at which courts deem the delay unreasonable enough to trigger the *Barker* inquiry.[29]  The Supreme Court, although it has noted that lower courts have generally found postaccusation delays approaching one year are "presumptively prejudicial,"[30] has not established a bright-line test.  The Supreme Court has, however, held that the presumption that pretrial delay has prejudiced an accused intensifies over time.[31]

Even if the delay in this case were sufficiently lengthy to cross the threshold dividing ordinary from "presumptively prejudicial" delay, Keomanivong does not prevail.  The California Court of Appeal, after determining that the threshold was crossed, carefully weighed the *Barker*

---

[25] *Vermont v. Brillon*, 555 U.S. ___, 129 S.Ct. 1283, 1290 (2009).

[26] *Reed v. Farley*, 512 U.S. 339, 353 (1994); *see Doggett v. United States*, 505 U.S. 647, 656 (1992).

[27] *Barker*, 407 U.S. at 521 ("deprivation of the right to speedy trial does not *per se* prejudice the accused's ability to defend himself").

[28] *Doggett*, 505 U.S. at 651-52.

[29] *Id.* at 652 n.1.

[30] *Id.*

[31] *Id*. at 652.

factors.[32]  Most notably, in this case, Keomanivong provides no factual basis other than his

continued pretrial incarceration for his conclusory statement that he was prejudiced by the delay.

Nor could he plausibly make such a showing.  Keomanivong "does not contend that vital

evidence fell into the prosecutor's hands (or slipped through his own fingers)" during the period

October 2002 through July 2003.[33]

This court cannot say that the decision of the California Court of Appeal was "contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by

the Supreme Court of the United States" or "was based on an unreasonable determination of the

facts in light of the evidence presented in the State court proceeding."[34]  Nor can this Court find

that the state court unreasonably applied the principles of *Barker-Doggett-Reed* to the facts of

Keomanivong's case within the scope of *Andrade-Williams-Schriro*.  Keomanivong is not

entitled to relief under his first ground.

<u>Ground 2:  Failure to Disclose Evidence Favorable to Defendant</u>.

Keomanivong contends that the prosecutor violated the requirements of the California

Penal Code by failing to turn over copies of letters that Keomanivong had allegedly written

while he was in jail awaiting trial.  The California Court of Appeal rejected Keomanivong's

arguments, holding:

> Before deciding whether to testify, Keomanivong asked if the prosecutor had any
> discovery applicable to him.  The prosecutor replied, "Not that I intend to give, in
> light of the court's ruling."  Keomanivong did not testify.

---

[32] The court notes that, although not necessarily conclusive, the factors weighed and discussed by
the California Court of Appeal in this case substantially mirrors the times excluded in the federal Speedy
Trial Act, 18 U.S.C. § 3161(h).

[33] *Reed*, 512 U.S. at 353 n.11.

[34] 28 U.S.C. § 2254(d).

Keomanivong contends the prosecutor's answer to whether he had discovery materials related to Keomanivong implied that he had letters and his refusal to turn them over to the defense violated Penal Code section 1054.1, subdivision (b). He further contends that failure was prejudicial because it robbed him of the ability to challenge the authenticity of the letters, crippled defense counsel in devising a strategy, denied Keomanivong effective assistance of counsel, and interfered with his decision whether to testify.

If the prosecutor had letters written by Keomanivong, his refusal to disclose them violated California's discovery law.  (Pen.Code, § 1054.1, subd. (b); *People v. Jackson, supra,* 129 Cal.App.4th 129, 168-172.)  The problem with Keomanivong's contention, however, is that it is entirely speculative.  The record does not show that such letters actually existed.  Accordingly, any effect their nondisclosure had on Keomanivong's defense is speculative.  We do not reverse convictions based upon mere speculation.  (Citations omitted.)[35]

  "[T]he Constitution does not require the prosecutor to share all useful information with the defendant."[36]  *Brady,*[37] and its progeny, require the Government to disclose material information that is "favorable to the accused, either because it is exculpatory, or because it is impeaching."[38]  In addition to the fact that, as the California Court of Appeal noted, the record does not show that such letters existed, Keomanivong has failed to show either (1) that the prosecutor had such letters, if they existed, or (2) what information those letters contained that might be exculpatory or impeaching.  Whatever transgression of state law may have occurred, Keomanivong has failed to carry his burden of establishing a *Brady* violation by a preponderance

---

[35] *Le*, 2006 WL 2949021 at *13-14.

[36] *United States v. Ruiz,* 536 U.S. 622, 629 (2002) (citing *Weatherford v. Bursey,* 429 U.S. 545, 549 (1977) ("There is no general constitutional right to discovery in a criminal case")).

[37] *Brady v. Maryland*, 373 U.S. 83 (1962).

[38] *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999).

of the evidence.  Because he has failed to establish a claim of constitutional dimension,[39]

Keomanivong is not entitled to relief under his second ground.

Ground 3:  Improper Jury Instruction on Self-Defense.

Keomanivong argues that the trial court erred in giving CALJIC 5.54 "Self-Defense by

an Aggressor" instead of CALJIC 5.56 "Self-Defense—Participants in Mutual Combat."

Respondent contends that, although this claim was presented to the California Court of Appeal it

was not raised in Keomanivong's petition for review filed with the California Supreme Court,

Keomanivong has not properly exhausted his state court remedies.  This court may not consider

claims that have not been fairly presented to the highest state court that may hear the claim.[40]  In

this case, the highest state court to which Keomanivong could have presented his claim is the

California Supreme Court.[41]  Having failed to present this claim to the California Supreme Court,

Keomanivong has failed to exhaust his available state court remedies.

Respondent further contends that because the Court of Appeal held that Keomanivong in

failing to object to the instruction in the trial court forfeited this claim, Keomanivong defaulted

and is procedurally barred from raising it in a federal habeas proceeding.  Again, the court

agrees.  Federal courts "will not review a question of federal law decided by a state court if the

decision of that court rests on a state law ground that is independent of the federal question and

adequate to support the judgment."[42]  This court may not reach the merits of procedurally

---

[39]  "'Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension.'"  *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)).

[40]  28 U.S.C. § 2254(b)(1); *see Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citing cases).

[41]  *Baldwin*, 541 U.S. at 29.

[42]  *Coleman v. Thompson,* 501 U.S. 722, 729 (1991).

15

defaulted claims.[43]  Although the ultimate burden of proving adequacy of a state procedural bar

is on the government, once it has "adequately pled the existence of an independent and adequate

state procedural ground as an affirmative defense, the burden to place that defense in issue shifts

to the petitioner."[44]  Keomanivong may satisfy his burden "by asserting specific factual

allegations that demonstrate the inadequacy of the state procedure, including citation to authority

demonstrating inconsistent application of the rule."[45]  In his traverse, Keomanivong simply

denies that the procedural default is independent and adequate, and contends that Respondent has

not carried his burden of proving a procedural default.  Consequently, Keomanivong has not

properly joined this issue.  Even had Keomanivong properly joined the issue, the California

contemporaneous-objection requirement to preserve a challenge to an instruction on appeal is an

independent and adequate state ground barring review in this court.[46]

       Because Keomanivong's instructional error claim was defaulted in state court on an

adequate and independent state ground, it cannot be considered in federal habeas proceedings

unless Keomanivong can demonstrate cause for the default and actual prejudice.[47]  He has not

done so.  Even if Keomanivong could show cause, he cannot show prejudice.  To prove a

fundamental miscarriage of justice, Keomanivong must show that a constitutional violation

probably resulted in his conviction despite his actual innocence.[48]  Although at the gateway stage

---

[43] *Sawyer v. Whitley,* 505 U.S. 333, 338 (1992).

[44] *Bennett v. Mueller*, 322 F.3d 573, 586 (9th Cir. 2003).

[45] *Id.*

[46] *See Paulino v. Castro*, 371 F.3d 1083, 1093 (9th Cir. 2004).

[47] *See Coleman v. Thompson,* 501 U.S. 722, 729 (1991).

[48] *See Schlup v. Delo,* 513 U.S. 298, 321-25 (1995) (linking miscarriages of justice to actual
innocence); *United States v. Olano,* 507 U.S. 725, 736 (1993) ("In our collateral-review jurisprudence,

he need not establish his innocence as an "absolute certainty," Keomanivong must demonstrate

that more likely than not, no reasonable juror could find him guilty beyond a reasonable doubt.[49]

Keomanivong's third ground fails.

<u>Ground 4:  Refusal to Discharge a Juror</u>.

In the course of the trial, a juror had a domestic violence altercation with his girlfriend

and reported her to the police.  Keomanivong contends that this compromised the juror's ability

to be impartial and the juror should have been excused.  The California Court of Appeal

summarized the background as follows:

> During trial, the prosecutor reported to the court on a "juror problem."  Juror
> No. 12 and his girlfriend were at a restaurant or bar and got into a fight.  The fight
> continued at home; the girlfriend threw things and pulled the phone out.  The
> police responded and took statements.  The district attorney sent the case back for
> further investigation.  The trial court was concerned that juror No. 12 might feel
> either beholden to or mad at the district attorney depending on what happened;
> the court wanted to keep the juror out of the district attorney's office.  The parties
> agreed the court needed to talk to juror No. 12.
>
> The court told the juror the matter was under investigation and the most important
> thing was that it not affect his judgment in this case.  The juror explained his
> girlfriend was arrested; he had posted bail for her, but they were living apart and
> had not reconciled.  He did not intend to pursue the complaint.  They had both
> been drinking and things got out of hand.  Neither he nor his girlfriend told the
> truth and he wanted the case dropped.
>
> Le made a motion to excuse juror No. 12 because he was a witness in a criminal
> case and he had admitted making false statements to the police.  Ek and
> Keomanivong agreed the juror was compromised.  The prosecutor said they were
> speculating; he preferred to wait and see what happened.  Le noted that if there
> were more alternates, there would be no discussion.  The court agreed, but there

---

the term 'miscarriage of justice' means that the defendant is actually innocent."); *Murray v. Carrier,* 477
U.S. 478, 496 (1986) ("in an extraordinary case, where a constitutional violation has probably resulted in
the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the
absence of a showing of cause for the procedural default.")

[49] *House v. Bell*, 547 U.S. 518, 538 (2006).

was only one alternate left.  The court decided to follow the prosecutor's suggestion and let the matter run its course.  If something happened, they could revisit the matter.

Le argued this case involved witnesses who had changed their story and the prosecutor's argument that such witnesses should be believed would resonate with juror No. 12 because "I've sinned, too, brother."  He argued keeping juror No. 12 violated due process.

The court decided to wait and admonished the juror not to discuss the matter with the other jurors.  Towards the end of the trial, the court raised the matter.  There was no news on the case of the juror's girlfriend and juror No. 12 remained on the jury.

Ek's motion for a new trial was based, in part, on the failure to remove juror No. 12.

All defendants contend the trial court erred in failing to excuse juror number 12 because he had lied to the police and was entangled with the district attorney's office.[50]

Respondent contends that although Keomanivong presented the issue to the California Court of Appeal on direct appeal, he did not present the claim in his petition for review before the California Supreme Court.  Thus, Respondent argues, Keomanivong has not properly exhausted his available state court remedies on this ground.  The court agrees for the reasons given above with respect to the third ground.[51]

Even had Keomanivong properly exhausted his state court remedies, he would not prevail.[52]  The California Court of Appeal rejected the defendants' arguments, holding:

Penal Code section 1089 provides in part:  "If at any time, whether before or after the final submission of the case to the jury, a juror dies or becomes ill, or upon other good cause shown to the court is found to be unable to perform his or her

---

[50] *Le*, 2006 WL 2949021 at *6-7.

[51] *Ante*, p. 15

[52] The failure to exhaust state court remedies notwithstanding, this court may nonetheless deny the claim on the merits.  28 U.S.C. § 2254(b)(2).

duty, ... the court may order the juror to be discharged...."  "'Before an appellate court will find error in failing to excuse a seated juror, the juror's inability to perform a juror's functions must be shown by the record to be a "demonstrable reality."  The court will not presume bias, and will uphold the trial court's exercise of discretion on whether a seated juror should be discharged for good cause under section 1089 if supported by substantial evidence.  [Citation.]' [Citations.]"  (*People v. Jablonski* (2006) 37 Cal .4th 774, 807.)  The record does not show as a demonstrable reality that juror No. 12 was unable to fulfill his obligations as a juror.

Le relies on cases where a juror lied to get on and stay on the jury, particularly *Dyer v. Calderon* (9th Cir.1998) 151 F.3d 970 (*Dyer* ).  We find *Dyer* distinguishable.  In *Dyer,* during voir dire a juror failed to disclose the killing of her brother that was similar to the crime being tried after she saw other jurors disclose lesser crimes and be dismissed.  Later, when questioned about her brother's death, she lied and pretended his death was an accident.  From these responses the reviewing court drew the inference that the juror "lied to preserve her status as a juror and to secure the right to pass on Dyer's sentence."  (*Id.* at p. 982.)  The court found the juror's repeated lying was incompatible with the truthseeking process of a trial.  (*Id.* at p. 983.)  The magnitude of her lies exposed a rare case of presumed juror bias.  (*Id.* at p. 984.)

A far different situation is presented here.  Although juror No. 12 apparently did not tell the truth to the police when they arrested his girlfriend, later, when sober and not fighting, he was remorseful and wanted to set the record straight.  His misstatements had no relationship to the trial on which he was a juror and did not show the contempt for the process so evident and disturbing in *Dyer, supra,* 151 F.3d 970.  Nor did he attempt to cover up his falsehoods; he was honest (and chagrined) when questioned by the court.

Keomanivong relies on cases where a juror was involved with the district attorney's office or charged with a crime.  In *People v. Farris* (1977) 66 Cal.App.3d 376, 385, a juror was dismissed after he was in custody on a felony charge.  The appellate court found good cause for the dismissal. The nature and extent of the charges against the juror, his attitudes evinced towards the police, and his concealment of his past and present scrapes with the law on voir dire showed his unfitness to serve as a juror.  (*Id.* at pp. 386-387.)  In *In re Devlin* (1956) 139 Cal.App.2d 810, at page 813, overruled on another point in *Larios v. Superior Court* (1979) 24 Cal.3d 324, 333, the court held where a juror in a criminal case is charged with a crime and expresses the desire to be relieved, the trial court has discretion to determine there is good cause to excuse the juror.

This case is more similar to *People v. Holt* (1997) 15 Cal.4th 619.  In *Holt,* a juror's son was arrested for felony assault.  On appeal, defendant contended the

juror should have been excused because he might have had some undisclosed liability in the incident or have harbored bias.  The high court disagreed, finding the defense concerns that the juror was biased or hoped to curry favor with the prosecution were speculation.  (*Id.* at pp. 658-659.)  Although *Holt* is distinguishable because there the defense did not seek to excuse the juror at trial, it is on point that pure speculation will not show a "demonstrable reality" sufficient to overturn the trial court's discretion in deciding whether to excuse a seated juror.  (*Id.* at p. 659.)

Because defendants have failed to show as a "demonstrable reality" that juror No. 12 could not perform the functions of a juror, their contention that he should have been excused fails.[53]

It is well-established constitutional law that a criminal defendant has a right under the Sixth Amendment to an impartial jury.[54]  It is also well-established that a "defendant is entitled to a fair trial, but not a perfect one, because there are no perfect trials."[55]  Under Supreme Court precedent, the appropriate remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to establish bias.[56]  The trial court followed that procedure in this case.  In a federal habeas proceeding, findings of the state court that a juror's conduct did not impair his ability to render an impartial verdict are presumptively correct.[57]  In this case, there is no evidence that the juror was unable to carry out his functions as a juror, was not impartial, or allowed his personal experience to interfere with weighing the evidence, or that he decided the

---

[53] *Le*, 2006 WL 2949021 at *7-8.

[54] *Irwin v. Dowd*, 366 U.S. 717, 722 (1961); *see Peters v. Kiff*, 407 U.S. 493, 501-02 (1972); *Turner v. Louisiana*, 379 U.S. 466, 471 (1965).

[55] *Brown v. United States*, 411 U.S. 223, 231-32 (1973) (internal citations and quotation marks omitted).

[56] *Smith v. Phillips*, 455 U.S. 209, 215 (1982); *Remmer v. United States*, 347 U.S. 227, 229 (1954); *see Dennis v. United States*, 339 U.S. 162, 171-72 (1950) ("Preservation of the opportunity to prove actual bias is a guarantee of a a defendant's right to an impartial jury.").

[57] *See Smith*, 455 U.S. at 218.

case on any basis other than the evidence.  Thus, Keomanivong has not shown that the failure to excuse the juror prejudiced him in any way.[58]

This court cannot say that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[59]  Nor can this court find that the state court unreasonably applied the correct legal principle to the facts of Keomanivong's case within the scope of *Andrade-Williams-Schriro*.  Keomanivong is not entitled to relief under his fourth ground.

Ground 5:  Ineffective Assistance of Trial Counsel.

Keomanivong claims his trial counsel was ineffective for not filing a motion to suppress his confession.  Specifically, he claims: (1) that his conversation with his wife should have been suppressed because the police lulled him to believe the conversation would be private, (2) that his confession should be suppressed because he was not advised of his right to refuse the involuntary voice stress test, (3) that his confession should be suppressed because the police denied him the right to make a phone call within three hours of his arrest, and (4) that the search of his house which occurred while he was being interviewed should have been challenged.  The California Court of Appeal rejected Keomanivong's postition, holding:

> Keomanivong contends his convictions must be reversed because he was denied effective assistance of counsel.  He contends counsel was ineffective in failing to

---

[58] *See Davis v. Woodford*, 384 F.3d 628 (9th Cir. 2004); *Anderson v. Calderon*, 232 F.3d 1053, 1098-99 (9th Cir. 2000), *overruled on other grounds by Osband v. Woodford*, 290 F.3d 1036 (9th Cir. 2002).

[59] 28 U.S.C. § 2254(d).

move to suppress his statement to the police, in which he admitted being present at the fight and the shooting, and admitted ownership of two guns, a nine-millimeter Beretta and a .22 caliber revolver.  Further, he contends counsel should have moved to suppress the two guns, which the police found in his car and his bedroom.  He contends both the confession and the discovery of guns were the product of illegal action by the police.

"The standards for ineffective assistance of counsel claims are well established.  'We presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions.' [Citation.]  To establish a meritorious claim of ineffective assistance, defendant 'must establish either:  (1) As a result of counsel's performance, the prosecution's case was not subjected to meaningful adversarial testing, in which case there is a presumption that the result is unreliable and prejudice need not be affirmatively shown [citations] or (2) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and there is a reasonable probability that, but for counsel's unprofessional errors and/or omissions, the trial would have resulted in a more favorable outcome. [Citations].' [Citation.]" (*People v. Prieto* (2003) 30 Cal.4th 226, 261.)

We defer to counsel's reasonable tactical decisions in reviewing a claim of ineffective assistance of counsel.  " ' "Tactical errors are generally not deemed reversible, and counsel's decision making must be evaluated in the context of the available facts."  [Citation.]  [¶] In the usual case, where counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions. [Citations.]' [Citation.]" (*People v. Jones* (2003) 29 Cal.4th 1229, 1254.)

We consider Keomanivong's various claims of illegal police conduct which, he asserts, should have been the foundation of motions to suppress his statement and the guns.

\* \* \* \*

B. Search of Keomanivong's Home

Keomanivong contends his attorney should have challenged the search of his bedroom that occurred while he was being interviewed after his arrest.  While the record does not expressly reveal the grounds asserted to validate the search, it does suggest that Keomanivong was on searchable probation.  In his interview with the police, Keomanivong admitted he had just been released from custody in Arizona on February 15; he described his wife keeping tabs on him as like she

was "my own parole officer."  Parole agent Gary Woffinden assisted Stockton police officers in the search.

We cannot find deficient performance on this record.  Where the record does not reveal the basis for counsel's challenged omission, the case is affirmed.  (*People v. Pope* (1979) 23 Cal.3d 412, 426 .)  Courts will not engage " 'in the perilous process of second-guessing.' "  (*Ibid*.)  This rule has even more force where the record, as here, suggests a valid reason for counsel not to take the challenged action.

     C. Denial of Phone Call

Keomanivong contends his confession was subject to suppression due to "the combination of illegalities" when he was first held by the police.  He contends the police illegally denied him the right to make a phone call within three hours of his arrest. (Pen.Code, § 851.5, subd. (a).)  Keomanivong told the police he was Laotian, born in Thailand.  He asserts he is a foreign national and the police should have advised him of his right to contact an official from a consulate of his country.  (Pen.Code, § 834c.)

 Penal Code section 851.5 provides that immediately upon being booked, and,except where physically impossible, no later than three hours after an arrest, an arrested person has the right to make at least three completed phone calls to an attorney, a bail bondsman, or a relative.  "These telephone calls shall be given immediately upon request, or as soon as practicable."  (Pen.Code, § 851.5, subd.(d).)

Keomanivong relies on *Carlo v. Chino* (9th Cir.1997) 105 F.3d 493 (*Carlo*), for the proposition that the denial of timely phone calls denied him due process.  In *Carlo*, plaintiff was arrested around midnight for driving under the influence and held overnight.  Despite her repeated requests, she was not allowed to make a phone call until 2:00 p.m. the following day.  (*Id*. at p. 495.)  She filed a section 1983 action, claiming her civil rights were violated.  The jury found in her favor and awarded nominal damages; the district court granted defendant's motion for a directed verdict and overturned the judgment.  (*Ibid*.)  On appeal, the Ninth Circuit reversed, finding California's Penal Code section 851.5 created a liberty interest that was entitled to the procedural protections of the Due Process Clause.  (*Carlo*, at p. 497.)  The court concluded that "holding an arrestee incommunicado is a restraint atypical of postarrest detention."  (*Id*. at p. 500.)  It noted the delay in allowing access to a phone permitted evidence to dissipate and kept plaintiff from contacting family members who might have posted bail.  (*Ibid*.)

Here, the record is not clear when Keomanivong was allowed to make his phone calls.  He contends he had to wait at least six hours.  Before the interview, there is

a reference to his cell phone; it is unknown whether he was able to use it after his arrest.  The interview of Keomanivong and other suspects was conducted at a police annex, not the main jail. During the interview he asked if he got a phone call.  He was told he would get one at the County jail and he would be taken there in three or four hours after the police spoke with the other suspects.  During the time he was held at the annex he was able to speak with his wife for 30 or 40 minutes.

*Carlo* is distinguishable. There an arrestee was denied the right to make a phone call for 14 hours; she was held "incommunicado."  (*Carlo, supra*, 105 F.3d 493 at p. 500.)  Keomanivong was able to speak to his wife, who could have contacted an attorney for him.  Keomanivong does not show that his defense was impaired by the delay in granting him phone access. Further, the record suggests a reason for the delay in granting phone privileges.  Presumably, the facilities at the annex, or the number of suspects, or both, made timely phone calls physically impossible. (Pen.Code, § 851.5, subd. (a).)

Penal Code section 834c implements the provisions of the Vienna Convention.  It requires a peace officer who detains a known or suspected foreign national for more than two hours to advise the foreign national of his right to communicate with an official from the consulate of his country. (Pen.Code, § 834c, subd. (a)(1).)  Assuming arguendo that this provision was violated, the United States Supreme Court recently held that assuming the Vienna Convention creates individual rights, suppression is not an appropriate remedy for a violation of those rights.  (*Sanchez-Llamas v. Oregon* (2006) 548 U.S. ---- [165 L.Ed.2d 557].)

Furthermore, Keomanivong has failed to show prejudice. Keomanivong had spent time in the United States; he spoke English and had prior experience with the criminal justice system.  He was fully advised of his constitutional rights under *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] before the police took his statement.  In these circumstances, there is no reason to believe he would have acted differently if advised of his right to contact a consulate.  (*United States v. Minjares-Alvarez* (10th Cir.2001) 264 F.3d 980, 988.)

Neither the denial of the right to make phone calls nor the failure to advise Keomanivong of any rights under the Vienna Convention provides a basis for suppressing his statement to the police.

   D. Involuntary Voice Stress Test

At about 3:00 p.m. the day of his arrest, Keomanivong was asked if he would take a voice stress test and he replied, "yep."  He was told it was a lie detector test and responded, "I don't care."  At 4:45 p.m. Detective Kamagaki came in to administer the test.  (Apparently, Keomanivong slept in the meantime.)  The test

was given twice because the first test showed Keomanivong had situational stress. In both tests Keomanivong denied he was present at the Bedlow shooting. Some time later Keomanivong told Detective Seraypheap that he was with Inthirath at the fight and the shooting and that he had two guns.

Keomanivong contends that a voice stress test is like a lie detector test and therefore he should have been advised of his right to refuse the test or have counsel with him when it was taken. He contends the test rattled him and he confessed shortly after it was given.

Keomanivong contends counsel was deficient in failing to move to suppress his statement because he was administered a voice stress test. This record does not show deficient performance by counsel; it suggests at least two sound tactical reasons not to challenge the administration of the test. (*People v. Jones, supra*, 29 Cal.4th at p. 1254.) First, Keomanivong consented to the test.

Second, the record does not support his causation argument, that the test caused him to confess. Keomanivong maintained that he was not present at the shooting both times he was asked during the test. After the test, Detective Kamigaki discussed Keomanivong's drug use with him. The detective then left. Later an unidentified officer told Keomanivong several witnesses identified him as being at the shooting. The officer also indicated the police had spoken to Keomanivong's wife, who did not completely support his alibi that he was with her at the time of the shooting; there were several hours that day where she did not know where he was. Detective Seraypheap told Keomanivong he knew he was with Inthirath that day; the detective had known Inthirath since he was a baby and knew his family. After further pointed discussion with Detective Seraypheap, Keomanivong confessed to being with Inthirath at the shooting. Before any questioning, the police advised Keomanivong of his Miranda rights. One could conclude it was the unraveling of his alibi and the aggressive questioning by Seraypheap, rather than the voice stress test, that caused Keomanivong to confess; this questioning was covered by the initial advisement of Miranda rights.

Since defense counsel may have reasonably concluded that a motion to suppress Keomanivong's statement due to the voice stress test would have failed, there is no ineffective assistance of counsel.

### E. Monitoring Conversation with Wife

Keomanivong initially told the police he was with his wife at the time of the shooting. While he was held in custody at the police annex, he was allowed to speak with his wife for 30 or 40 minutes. They were left alone in the interview room, but the tape continued to run. The police could hear a portion of their conversation. Keomanivong told his wife he was not at the shooting and was

innocent. His wife told him she had told the police he was not with her for about two hours that day.  When the police came back in the interview room, they told Keomanivong his wife did not support his alibi. He confessed to being at Bedlow shortly thereafter.

Keomanivong contends the police lulled him and his wife into believing they could speak in private and monitoring that conversation violated the marital privilege and the Fourth Amendment.  Keomanivong relies on *North v. Superior Court* (1972) 8 Cal.3d 301 (*North*).

In *North*, the court noted that generally a prisoner has no reasonable expectation of privacy in jail.  (*North, supra*, 8 Cal .3d at p. 308.) "In view of the general rule that an inmate of a jail or prison has no reasonable expectation of privacy, it would follow that an ordinary conversation between spouses could not be deemed to have been 'made in confidence,' as required by Evidence Code section 980 to establish the privilege." (*Id*. at p. 311.)  The court found an exception in the case before it because the arrestee and his wife "were lulled into believing their conversation would be confidential" by the detective's actions in surrendering his private office to them and then leaving and shutting the door.  (*Ibid*.)

The exception of *North, supra*, 8 Cal.3d 301 is not applicable here. Nothing indicates Keomanivong and his wife were "lulled" into believing their conversation was confidential; it did not occur in a private office, but in an interview room where defendant's statements were being taped and where various detectives came and went.  Further, it appears the police learned that Keomanivong's wife did not support his alibi not from eavesdropping on their conversation, but from a direct conversation with her. Monitoring the conversation of Keomanivong and his wife provided no basis for a motion to suppress.[60]

Under *Strickland*, to demonstrate ineffective assistance of counsel, Keomanivong must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.[61]  A deficient performance is one in which counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment.[62] Petitioner must show that defense counsel's representation was not within the range of

---

[60] *Le*, 2006 WL 29459021 at *22-27.

[61] *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

[62] *Id*.

competence demanded of attorneys in criminal cases, and that there is a reasonable probability

that, but for counsel's ineffectiveness, the result would have been different.[63]  An analysis that

focuses "solely on mere outcome determination, without attention to whether the result of the

proceeding was fundamentally unfair or unreliable, is defective."[64]

     *Strickland* and its progeny do not mandate this court act as a "Monday morning

quarterback" in reviewing tactical decisions.[65]  Indeed, the Supreme Court admonished in

*Strickland*:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too
> tempting for a defendant to second-guess counsel's assistance after conviction or
> adverse sentence, and it is all too easy for a court, examining counsel's defense
> after it has proved unsuccessful, to conclude that a particular act or omission of
> counsel was unreasonable.  A fair assessment of attorney performance requires
> that every effort be made to eliminate the distorting effects of hindsight, to
> reconstruct the circumstances of counsel's challenged conduct, and to evaluate
> the conduct from counsel's perspective at the time.  Because of the difficulties
> inherent in making the evaluation, a court must indulge a strong presumption that
> counsel's conduct falls within the wide range of reasonable professional
> assistance; that is, the defendant must overcome the presumption that, under the
> circumstances, the challenged action might be considered sound trial strategy.
> There are countless ways to provide effective assistance in any given case.  Even
> the best criminal defense attorneys would not defend a particular client in the
> same way.[66]

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

---

[63] *Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

[64] *Lockhart v. Fretwell,* 506 U.S. 364, 369 (1993); *see Strickland,* 466 U.S. at 687; *see also
Kimmel v. Morrison.,* 477 U.S. 365, 374 (1986) ("The essence of an ineffective-assistance claim is that
counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the
trial was rendered unfair and the verdict rendered suspect"); *United States v. Cronic,* 466 U.S. 648, 258
(1984) ("the right to the effective assistance of counsel is recognized not for its own sake, but because of
the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged
conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not
implicated.").

[65] *See Harris v. Reed*, 894 F.2d 871, 877 (7th Cir. 1990).

[66] 466 U.S. at 689 (internal citations and quotation marks omitted).

The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable-a substantially higher threshold." *Schriro, supra,* at 473, 127 S.Ct. 1933.  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  See *Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").[67]

It is through this doubly deferential lens that a federal habeas court reviews *Strickland* claims under the § 2254(d)(1) standard.[68]  The Supreme Court has identified three circumstances in which prejudice is presumed: (1) complete denial of counsel at any critical stage of a criminal proceeding; (2) failure by defense counsel to subject prosecution's case to any meaningful adversarial testing; and (3) cases in which counsel is called upon to render assistance under circumstances where competent counsel very likely could not.[69]

Keomanivong bears the burden of proving that counsel's trial strategy was deficient. "[T]he defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"[70]  "[He] bears the heavy burden of proving that counsel's assistance was neither reasonable nor the result of sound trial strategy."[71]  "In determining whether the defendant received effective assistance of counsel, 'we will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight,' but

---

[67] *Knowles v. Mirzayance*, 556 U.S. ___, 129 S.Ct.1411, 1420 (2009).

[68] *See Id.* (citing *Yarborough v. Gentry*, 540 U.S. 1, 5–6 (2003)).

[69] *Bell v. Cone*, 535 U.S. 685, 695-96 (2002) (discussing *Cronic*).

[70] *Strickland*, 466 U.S. at 689.

[71] *Murtishaw v. Woodford*, 255 F.3d 926, 939 (9th Cir. 2001).

rather, will defer to counsel's sound trial strategy."[72]  "Because advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions, strategic choices must be respected in these circumstances if they are based on professional judgment."[73]

"A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment."[74]  The court must then consider those acts or omissions against "prevailing professional norms."[75]  Even then, "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."[76]  Keomanivong has not carried this heavy burden.  He has shown no evidence indicating that counsel was unreasonable or ineffective for selecting his chosen trial strategy. Keomanivong presented no alternate attorney's determination challenging counsel's decision to pursue an intoxication defense.  Nor has he quoted any "[p]revailing norms of practice as reflected in American Bar Association standards and the like" indicating that counsel acted outside these norms.[77]

This court cannot say that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by

---

[72] *Id.* (quoting *Strickland*, 466 U.S. at 689).

[73] *Strickland*, 466 U.S. at 681.

[74] *Id*. at 690.

[75] *Id*.

[76] *Id*.

[77] *Id.* at 688.

the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[78]  Nor, viewing the matter through the doubly-deferential lens of *Mirzayance*, can this Court find that the state court unreasonably applied the correct legal principle to the facts of the Petitioner's case within the scope of *Andrade-Williams-Schriro*.  Keomanivong has failed to establish that counsel committed any error that was so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment or that his defense was prejudiced, as required by *Strickland-Hill*.  In particular, Keomanivong has failed to overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Keomanivong is not entitled to relief under his fifth ground.

Ground 6: *Kurtzman* error.

Keomanivong contends that his convictions for murder and attempted murder must be overturned because the trial court told the jury not to consider whether he was guilty of manslaughter until after they had agreed as to his guilt on murder in violation of the California *Kurtzman* rule.  Respondent contends Keomanivong presented the issue to the California Court of Appeal on direct appeal, but did not present that claim in his petition for review before the California Supreme Court, and so has not properly exhausted his available state court remedies. The court agrees for the reasons given above with respect to the third ground.[79]

---

[78] 28 U.S.C. § 2254(d).

[79] *Ante*, p. 15.

Even if Keomanivong had properly exhausted his state court remedies he would not

prevail.[80]  In rejecting Keomanivong's argument, the California Court of Appeal held:

> In *Kurtzman*, the California Supreme Court held: "[O]ur decision in *Stone v.
> Superior Court* (1982) 31 Cal.3d 503[ ], properly interpreted, simply restricts a
> jury from *returning a verdict* on a lesser included offense before acquitting on a
> greater offense and does not preclude a jury from *considering* lesser offenses
> during its deliberations." (*Kurtzman, supra*, 46 Cal.3d at p. 324, italics in
> original.)
>
> Here, the trial court properly instructed the jury on the rule of *Kurtzman, supra*,
> 46 Cal.3d 322. "Now, the crime of manslaughter is a lesser included crime to that
> of murder charged in Count One. The crime of attempted manslaughter is lesser
> to that of attempted murder as charged in Counts Two through Seven. [¶] Thus,
> you are to determine whether a defendant is guilty or not guilty of the crimes
> charged in Counts One through Seven, either murder or attempted murder, or of
> any lesser crimes, either manslaughter or attempted manslaughter. [¶] In doing so,
> you have discretion to choose the order in which you evaluate each crime and
> consider the evidence pertaining to it. You may find it productive to consider and
> reach a tentative conclusion on all charges and lesser crimes before reaching any
> final verdict. [¶]  However, the Court cannot accept a guilty verdict on a lesser
> crime unless you have unanimously found the defendant not guilty of the greater
> crime."
>
> Just before the jury retired for deliberation, the court went over the verdict forms
> in the case. "They're pretty self-explanatory, but they are very long in this case."
> The verdict forms the jury returned comprise over 120 pages of the clerk's
> transcript. The court went over the forms for murder and the various special
> circumstances and enhancements, indicating the foreperson had to sign each form.
> After the court had gone through the verdict forms for murder, it told the jury,
> "Then, as I explained to you, if all 12 of you unanimously agree that the
> defendant is not guilty of murder, then you can consider whether he may be guilty
> of manslaughter. And, so, there's a manslaughter verdict here providing for guilty
> of manslaughter. If all 12 of you agree upon that, then you date and sign that one.
> But, of course, first all 12 have to agree he's not guilty of murder before you can
> do that."
>
> We find no *Kurtzman* error. "Jury instructions must be read together and
> understood in context as presented to the jury. [Citation.]" (*People v. Ayers*
> (2005) 125 Cal.App.4th 988, 997 .) Read in context, a reasonable juror would not

---

[80] The failure to exhaust state court remedies notwithstanding, this court may nonetheless deny
the claim on the merits.  28 U.S.C. § 2254(b)(2).

have understood the court's comments to forbid the jury from considering manslaughter until it had acquitted defendant of murder. First, the court expressly referred the jury to its previous instruction, which correctly stated the law as to how the jury was to approach deliberations. Second, the challenged language addressed only completing the verdict forms, not the order of deliberation; the court correctly told the jury it could not accept a verdict on manslaughter unless the jury had acquitted the defendant of murder.[81]

The issue presented is purely one concerning whether an instruction comports with state law.  The California Court of Appeal rejected Keomanivong's arguments on appeal, holding that the trial court's instruction was proper under California law.  This court, as it must, defers to the California court's interpretation of California law.[82]  Because he has failed to raise an issue of constitutional dimension, Keomanivong is not entitled to relief under his sixth ground.

Ground 7: Insufficient Evidence to Support a Gang Member Enhancement.

Keomanivong argues that there was insufficient evidence to support the gang special circumstance enhancement because he was not a member of ABZ.   Respondent contends that although Keomanivong presented the issue to the California Court of Appeal on direct appeal, he did not present that claim in his petition for review before the California Supreme Court.  Thus, Respondent argues, Keomanivong has not properly exhausted his available state court remedies.  The court agrees for the reasons given above with respect to the third ground.[83]

Even had Keomanivong properly exhausted his state court remedies, he would not prevail.[84]   In rejecting Keomanivong's argument, the California Court of Appeal held:

---

[81] *Le*, 2006 WL 2949021 at *3.

[82] *Bradshaw v. Hickey*, 546 U.S. 74, 76 (2005).

[83] *Ante*, p. 15.

[84] The failure to exhaust state court remedies notwithstanding, this court may nonetheless deny the claim on the merits.  28 U.S.C. § 2254(b)(2).

The gang special circumstance (Pen.Code, § 190.2, subd. (a)(22)) was charged as to all three defendants and the jury found it true as to each. The evidence established that Le and Ek were members of the Asian Boyz gang, a rival of ASW. Keomanivong was a member of the Asian Gangsters gang.  In closing argument, the prosecutor told the jury it did not matter that Keomanivong was a member of a different gang, the crimes were still committed in association with or for the benefit of a criminal street gang.

Keomanivong contends the finding of the gang special circumstance must be reversed as to him because there is no evidence that he was a member of the ABZ gang.  He contends that under Penal Code section 190.2, subdivision (a)(22), the defendant must be an active member of a gang and the murder must further the activities of that gang.

Penal Code section 190.2, subdivision (a)(22) sets forth a special circumstance: "The defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."FN11

> FN11. Penal Code section186.22, subdivision (f) defines a criminal street gang as "any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated in paragraphs (1) to (25), inclusive, of subdivision (e), having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal street gang activity."

Keomanivong focuses on the language at the end of Penal Code section 190.2, subdivision (a)(22): "the murder was carried out to further the activities of *the* criminal street gang." (Italics added.)  He contends the use of the definite article "the" rather than an indefinite "a" indicates that the defendant must be an active member of the same gang for whose benefit the murder is carried out.  He contends the language is clear and unambiguous and requires no construction. (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1007-1008.)  " 'In construing [a] statute, [the] definite article " the " particularizes the subject which it precedes and is [a] word of limitation as opposed to [an] indefinite or generalizing force [such as] " a " or " an." ' [Citation.]" (*CD Investment Co. v. California Ins. Guarantee Assn.* (2000) 84 Cal.App.4th 1410, 1421.)

The Attorney General responds that Keomanivong's construction of the statute is nonsensical and ignores the realities of shifting alliances in the world of criminal street gangs.  The Attorney General stresses that both ABZ and Asian Gangsters

were Crip gangs, but ignores that ASW was also a Crip gang.  The gang expert, Detective Beardsley, testified it was not uncommon for there to be rivalries among various Crip gangs. He also indicated there was rivalry, including shootings, between the Asian Gangsters and ABZ.  Keomanivong told the police no gang in Stockton, including ABZ, liked the Asian Gangsters " 'cause AG's original."

We agree with Keomanivong's construction of the gang special circumstance to the extent that the use of "the" denotes the same gang as previously referred to in the statute.  We disagree, however, that defendant must be an active "member" of that gang; the statute requires only that he be an "active participant."  (Pen.Code, § 190.2, subd. (a)(22).) The Attorney General argues that when Keomanivong returned from prison, nearly all of his fellow Asian Gangsters were gone; he was now "a free agent."

The jury was instructed:  "To find that the special circumstance of intentional killing by an active street gang member is true, it must be proved that the defendant intentionally killed a victim, at the time of the killing defendant was an active participant in a criminal street gang, the members of that gang engage in or have engaged in a pattern of criminal gang activity, the defendant knew that the members engaged in or have engaged in a pattern of criminal gang activity, and the murder was carried out to further the activities of the criminal street gang."  The jury was further instructed:  " 'Active participation' means that the person must have a relationship with the criminal street gang that is more than in name only, passive, inactive or purely technical."  Keomanivong does not challenge these instructions.

The evidence was that Keomanivong went with his cousin Inthirath to the fight on Bedlow.  He told Detective Seraypheap that, "Goofy had asked him to back him up, 'cause there was going to be a jump out and a fight.' "  The entire escapade was criminal street gang activity; Keomanivong joined willingly and was armed. He was seen getting a firearm out of the trunk of the car and firing several times at the ASW members.  The evidence was sufficient to establish that on the afternoon of March 17, 2002, Keomanivong's participation in the criminal street gang activities of ABZ was " 'more than nominal or passive.' " (*People v. Castenada* (2000) 23 Cal.4th 743, 752.)  Substantial evidence supports the gang special circumstance.[85]

The Supreme Court explained in *Jackson* that the constitutional standard for sufficiency

of the evidence is whether, "after viewing the evidence in the light most favorable to the

---

[85] *Le*, 2006 WL 2949021 at *28-29.

prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[86]  This court must, therefore, determine whether the decision of the California Court of Appeal unreasonably applied *Jackson*.

Keomanivong misperceives the role of a federal court in a habeas proceeding challenging a state-court conviction.  This court is precluded from either re-weighing the evidence or assessing the credibility of witnesses.  Under *Jackson*, this court's role is to determine whether there is any evidence, which if accepted as credible by the jury, is sufficient to sustain conviction.[87]  Keomanivong has the burden to establish by clear and convincing evidence that the factual findings of the jury were erroneous.  Keomanivong has failed to carry this burden..

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.[88]  Consequently, although the sufficiency of the evidence review by this court is grounded in the Fourteenth Amendment, it must undertake its inquiry by reference to the elements of the crime as set forth in state law.[89]  This court must also be ever mindful of the deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency review.[90]  In this case, the California Court of Appeal, applying and construing California law, found that there was sufficient evidence to support the finding by the jury that the gang special circumstance charge was true.  A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct

---

[86] *Jackson v. Washington*, 443 U.S. 307, 319 (1979) (emphasis in the orginal).

[87] *See Schlup v. Delo*, 513 U.S. 298, 340 (1995).

[88] *See Engle v. Isaac*, 456 U.S. 107, 128 (1982).

[89] *Jackson*, 443 U.S. at 324 n.16.

[90] *Juan H. v. Allen*, 406 F.3d 1262, 1275 (9th Cir. 2005).

appeal of the challenged conviction, binds a federal court sitting in habeas corpus."[91]  A determination of state law by a state intermediate appellate court is also binding in a federal habeas action.[92]  Keomanivong has not raised an issue of constitutional dimension and is, therefore, not entitled to relief under his seventh ground.

**B.  Grounds Raised by Joinder in Ek's Arguments**.

Ground 8:  Restrictions on the Jury Selection *Voir Dire*.

Prior to the commencement of the trial, the San Joaquin Superior Court imposed certain restrictions on jury *voir dire*.  The California Court of Appeal summarized the *voir dire* procedure adopted by the San Joaquin Superior Court:

> Prior to trial, the prosecutor indicated he intended to use a questionnaire in jury selection.  The trial court told the parties that since there were three defendants and use of a juror questionnaire was so time consuming, they had a choice:  they could use a questionnaire, in which case no oral voir dire would be allowed, or they could select the jury through oral voir dire, with time limits.  The prosecutor objected to having to choose and asked why.  The court explained the reason was time.  He thought a juror questionnaire was "a big waste" of time.  The prosecutor continued to object, claiming it was "not fair."  The trial court believed juror questionnaires should be reserved for unique cases; the court was firm that if a questionnaire was used, he would not voir dire any potential jurors.

> The defendants all wanted to use a questionnaire.  Keomanivong's counsel suggested the questionnaire be used for background and voir dire be permitted on the law.  The court told the prosecutor challenges for cause would be based solely on the questionnaire, without further voir dire.  The court would allow some questions to rehabilitate a potential juror.

> After the questionnaires were completed by prospective jurors, the court maintained its position of no voir dire.  The prosecutor objected, noting some

---

[91] *Bradshaw,* 546 U.S. at 76; *see also West v. AT & T,* 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law. . . .").

[92] *See Hicks v. Feiock,* 485 U.S. 624, 629-30 & n.3 (1988) (noting state appellate court's determination of state law is binding and must be given deference).

questions were left blank.  The court responded that was what peremptory challenges were for.  Counsel should make their decision whether to use a questionnaire based on whether people are smart enough to complete it.

Prospective jurors were given a 12-page questionnaire to complete.  The questionnaire asked for  background information about the juror's age, marital status, employment, military service, education, and experience with the legal system.  It asked about prior jury service and law enforcement contacts.  There were a series of questions concerning knowledge of and opinions about gangs.  It then asked about the juror's knowledge of the case.  The final questions addressed opinions about certain legal principles, including aiding and abetting, self-defense, the presumption of innocence, bias, and firearms.[93]

Ek argues in his petition that this procedure, and the trial court's inconsistent application of the rehabilitation exception allowing followup oral questioning, produced a *voir dire* so deficient that it violated the Sixth Amendment right to an impartial jury.  The California Court of Appeal rejected the defendants' argument:

> Defendants contend the trial court erred in eliminating or restricting oral voir dire.  The Attorney General responds that defendants' failure to object below bars the contention on appeal.  It is true that defendants did not voice objections to the trial court's procedure for jury selection at the time.  Ek raised the restriction on voir dire as one ground for his motion for a new trial.  The prosecutor, however, repeatedly raised objections to the elimination of oral voir dire and the trial court overruled his objections.  There is no basis in the record for believing an objection by defense counsel would have fared better.  Failure to object does not bar appellate review of an issue when an objection would have been futile. (*People v. Hill* (1998) 17 Cal.4th 800, 820; *People v. Abbaszadeh* (2003) 106 Cal.App.4th 642, 648.)  Since the trial court proceeded despite vigorous objection by the prosecution, we review defendants' contention.
>
> Code of Civil Procedure section 223 addresses the examination of prospective jurors in criminal cases.  It provides that the court shall conduct the initial examination and the court may limit the oral and direct questioning of prospective jurors by counsel.FN3  (Code Civ. Proc., § 223.)  "Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause."  The trial court's exercise of its discretion in conducting voir dire "shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a

---

[93] *Le*, 2006 WL 2942091 at *3-4.

miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution."

> FN3. The trial court expressed concern about counsel wanting to ask the same questions that were on the questionnaire and taking too much time. The court can control the process by limiting the questions that may be asked by counsel.  (Citation omitted.)

A juror questionnaire may be used for assisting the voir dire process.  (Citation omitted.)

Voir dire, the legal term describing the process of jury selection, "is itself a combination of two French verbs meaning 'to see' and 'to say.' [Citation.]"  (*People v. King* (1987) 195 Cal.App.3d 923, 932.)  The importance of observing prospective jurors as they answer questions is well established.  "Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored.  Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled. [Citations.]"  (*Rosales-Lopez v. United States* (1981) 451 U.S. 182, 188 [68 L.Ed.2d 22, 28].)  The selection of jurors is often based on their demeanor and response to questions.  (*Ibid.; People v. Tuilaepa* (1992) 4 Cal.4th 569, 587; *People v. Wheeler* (1978) 22 Cal.3d 258, 276; see also *Mu'min v. Virginia* (1991) 500 U.S. 415, 424 [114 L.Ed.2d 493, 505].)

One potential problem that oral voir dire can screen is illustrated in this case.  At least one prospective juror had difficulty understanding spoken English.  Although this prospective juror noted the problem on the questionnaire, there could be situations where a prospective juror is reluctant to disclose his unfamiliarity with spoken English and the difficulty would not be noticed without oral voir dire.

Selection of a jury solely through the use of a written questionnaire, without any oral voir dire, raises serious questions.  For example, in *People v. Stewart* (2004) 33 Cal.4th 425, 440, a capital case, the trial court excused five potential jurors for cause over defense objection based solely on their answers to a questionnaire, without an opportunity for follow-up questions.  The California Supreme Court found the excusals were error that required the reversal of defendant's death sentence.  (*Id.* at pp. 454-455 .)  The court noted the resources available to assist the trial court in properly conducting voir dire "proceed on the assumption that, except for prospective jurors who both parties stipulate should be excused for cause [citation], a juror questionnaire will not *obviate* the need for oral voir dire, but instead merely will shorten the time necessary to be spent on oral voir dire. [Citation.]"  (*Id.* at p. 450, fn. 14, italics in original, but see *People v. Avila* (2006)

38 Cal.4th 491, 531 [holding excusal for cause based solely on written questionnaire may be permissible in capital case].)

 If the trial court had conducted jury selection based solely on the written questionnaire, as it initially stated it would, we might have to find reversible error. Fortunately, we need not decide that question because that is not what happened in this case.  After a challenge for cause, the court allowed the opposing party to rehabilitate the challenged prospective juror and allowed questions concerning ambiguous or troubling answers on the questionnaire.  Thus, there was extensive oral voir dire by counsel of some prospective jurors.

We turn now to defendants' specific claims of error.  Initially, we note defense counsel did not exhaust their peremptory challenges or object to the jury as constituted, nor did they justify their failure to do so.  Therefore, they may not challenge on appeal the trial court's denial of any challenge for cause.  (*People v. Lewis* (2001) 25 Cal.4th 610, 634; *People v. Waidla* (2000) 22 Cal.4th 690, 715.)

 Le contends a substantial number of juror questionnaires provided insufficient information on which to base intelligent decisions to challenge the prospective jurors.  Le fails, however, to cite any instance in which he wanted to ask follow-up questions and the trial court precluded him from doing so.  We recognize that when voir dire is so inadequate as to prevent intelligent exercise of challenges, the use of peremptory challenges cannot cure the harm, so exhaustion of peremptory challenges is not required to raise the issue on appeal.  (*People v. Bolden* (2002) 29 Cal.4th 515, 537-538.)  In this case, the trial court did allow follow-up questions when requested.  Therefore, we cannot say the jury selection process was completely inadequate.  Le must show he was denied the opportunity for adequate voir dire and he fails to do so.

Ek's argument is more detailed, citing specific answers from several prospective jurors he considers troubling.  The record does not demonstrate that Ek's trial counsel shared the same concern as Ek's appellate counsel.  As to those prospective jurors who were not seated, Ek fails to show any prejudice from the allegedly inadequate voir dire.  As to those prospective jurors who were actually seated as jurors, Ek fails to show trial counsel raised any concern about their answers or requested any follow-up questions.  There was a challenge to juror No. 9, whose answers appeared to assume defendants were gang members.  The trial court admonished the prospective jurors that gang membership remained something to be proven.  The court denied Le's challenge to juror No. 10, accepting her claim she could give full attention to the trial despite her personal problems.  This juror was later excused.  Two alternate jurors who were later seated as jurors were subject to oral voir dire.  Ek has failed to show the trial court denied any request for oral voir dire of any prospective juror who was later seated as a juror.

While the trial court controls the manner of jury selection, at a minimum defendant and his counsel should be given the opportunity to see the prospective jurors respond to questions.  Here the trial court afforded that opportunity only as to some prospective jurors, to rehabilitate those challenged for cause or to clarify ambiguous or troubling answers on the questionnaire.  We do not condone such a radical departure from the usual voir dire in a special circumstance murder case.  Nonetheless, given that voir dire is only for the purpose of exercising challenges for cause (Code Civ. Proc., § 223), only the prosecutor objected to the trial court's conduct of voir dire, and defendants have failed to show their request to voir dire any prospective juror who actually sat was denied, we find no reversible error.[94]

As the Supreme Court observed in *Rosales-Lopez* (cited by the California Court of

Appeal):

> Despite its importance, the adequacy of *voir dire* is not easily subject to appellate review.  The trial judge's function at this point in the trial is not unlike that of the jurors later on in the trial.  Both must reach conclusions as to impartiality and credibility by relying on their own evaluations of demeanor evidence and of responses to questions.  See *Ristaino v. Ross*, 424 U.S. 589, 595, 96 S.Ct. 1017, 1020, 47 L.Ed.2d 258 (1976), quoting *Rideau v. Louisiana*, 373 U.S. 723, 733, 83 S.Ct. 1417, 1422, 10 L.Ed.2d 663 (1963) (Clark, J., dissenting).  In neither instance can an appellate court easily second-guess the conclusions of the decision-maker who heard and observed the witnesses.

> Because the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the *voir dire*.  In *Aldridge v. United States*, 283 U.S. 308, 51 S.Ct. 470, 75 L.Ed. 1054 (1931), the Court recognized the broad role of the trial court: "[T]he questions to the prospective jurors were put by the court, and the court had a broad discretion as to the questions to be asked."  *Id.*, at 310, 51 S.Ct., at 471.  See also *Ham v. South Carolina*, 409 U.S. 524, 528, 93 S.Ct. 848, 851, 35 L.Ed.2d 46 (1973) (recognizing "the traditionally broad discretion accorded to the trial judge in conducting *voir dire*....").  Furthermore, Rule 24(a), Federal Rules of Criminal Procedure, provides that the trial court may decide to conduct the *voir dire* itself or may allow the parties to conduct it.  If the court conducts it, the parties may "supplement the examination by such further inquiry as [the court] deems proper"; alternatively, the court may limit participation to the submission of additional questions, which the court must ask only "as it deems proper."[95]

---

[94] *Le*, 2006 WL 2949021 at *4-6.

[95] *Rosales-Lopez*, 451 U.S. at 188-89.

Given the broad discretion the Supreme Court has accorded trial judges in conducting *voir dire*, this court cannot say that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[96]  Nor can this court find that the state court unreasonably applied the correct legal principle to the facts of Keomanivong's case within the scope of *Andrade-Williams-Schriro*.  Perhaps most importantly, as the California Court of Appeal noted, there is no showing that the trial court denied any request for oral *voir dire* of any prospective juror who was later seated as a juror.[97] Keomanivong is not entitled to relief under his eighth ground.

---

[96] 28 U.S.C. § 2254(d).

[97] *See United States v. Anzalone*, 886 F.2d 229, 234 (9th Cir. 1989) ("[Ek's] attorney was allowed to submit questions to the district judge to be asked on voir dire and did not submit this question. He cannot now claim he was denied a fair trial solely because this question was not asked.")

<u>Ground 9:  Prosecutorial Misconduct</u>.

In his petition, Ek contends that the prosecutor misstated the burden of proof, which resulted in a denial of his due process right to be found guilty beyond a reasonable doubt.  The California Court of Appeal summarized the underlying facts.

> At the end of his rebuttal argument, the prosecutor addressed the concept of reasonable doubt.  He first told the jury that reasonable doubt could not be reduced to a numerical percentage, such as 90 percent certain.  He indicated he could never reach 100 percent certainty and was not required to answer every question posed by the evidence.  He then stated:

> "I don't like the instruction on beyond a reasonable doubt because I think it's phrased in the negative.  It says you have a reasonable doubt if you don't have an abiding conviction of the truth of the charge.  [¶]  To me, in my mind, it's easier if you flip it around and put it in the positive.  If you have an abiding conviction of the truth of the charge, then you're convinced beyond a reasonable doubt.  And it's very simple when you look at it that way.  [¶]  You have to have an abiding conviction of the truth of the charge.  Well, what does abiding mean?  Abiding means lasting.  What does conviction mean?  It means strong belief.  You have to have a lasting strong, belief of the truth of the charge to convict. And that is all.  That is essentially the same standard-"

> At this point Le's counsel asked to approach. Before argument, in response to the prosecutor's concern about speaking objections, the trial court ruled any objection to argument had to be made by approaching the bench.  After the unreported conference, the trial court instructed the jury:  "Again, ladies and gentlemen, I remind you the definitions that you are to use have to come from these instructions."

> The prosecutor continued his argument:  "This abiding conviction has to last-well, actually there's no set time limit on how long it should last.  If you want to forget about us in a month and forget that you ever heard about this case, that's okay. [¶] As long as you can recite somewhat the facts of this case, that you know that three carloads of ABZ gang members armed themselves with two rifles and two handguns, drove into Bedlow looking for a fight with rivals and they shot up that street, as long as you can remember that, that's how long your abiding conviction should last."  The prosecutor ended his argument shortly thereafter.

> During a 15-minute break before jury instructions, the reporter read back this argument about reasonable doubt.  Le's counsel contended the argument after the admonishment made the misstatement of the reasonable doubt standard "even

worse."  He urged the admonishment was insufficient; the argument lessened and diluted the burden of proof.  He asked for a mistrial.  Ek and Keomanivong joined in the motion, which was denied.

Defendants contend the prosecutor's argument that an abiding conviction need not last long reduced the burden of proof and was a structural error requiring reversal.[98]

The California Court of Appeal in rejecting the arguments of the defendants, held:

> To establish guilt beyond a reasonable doubt, the factfinder must reach a subjective state of near certitude of the guilt of the accused.  (*Jackson v. Virginia* (1979) 443 U.S. 307, 315 [61 L.Ed .2d 560, 571].)  An abiding conviction has a lasting and permanent nature; it must be strongly and deeply held. (*People v. Brigham* (1979) 25 Cal.3d 283, 290-291.)  "The word 'abiding' here has the signification of settled and fixed, a conviction which may follow a careful examination and comparison of the whole evidence."  (*Hopt v. Utah* (1887) 120 U.S. 430, 439 [30 L.Ed. 708, 711].)

> The significance of "abiding conviction" with respect to the reasonable doubt standard is the depth and certainty of the belief, not how long the belief is held.  The prosecutor told the jury an abiding conviction was "a lasting, strong belief of the truth of the charge to convict."  We find no error in this formulation.

> To the extent the prosecutor may have weakened the reasonable doubt standard by his further discussion of how long an abiding conviction must last, the pertinent question is whether there is a reasonable likelihood the jury understood it could convict based on proof of less than beyond a reasonable doubt. (*Victor v. Nebraska* (1994) 511 U.S. 1, 6 [127 L.Ed.2d 583, 591].)  We conclude there was no such reasonable likelihood.  The trial court properly instructed the jury on the presumption of innocence, the reasonable doubt standard, and the People's burden to prove guilt beyond a reasonable doubt.  Further, the court instructed the jury it should use the definitions provided by the court.  Absent some indication in the record to the contrary, we presume the jury followed the court's instructions. (*People v. Jablonski, supra,* 37 Cal.4th 774, 806-807; *People v. Boyette* (2002) 29 Cal.4th 381, 436.)  Finally, all three defense counsel stressed the reasonable doubt standard in their closing arguments.[99]

---

[98] *Le*, 2006 WL 2949021 at *14-15.

[99] *Le*, 2006 WL 2949021 at *15.

"To warrant habeas relief, prosecutorial misconduct must 'so infect the trial with unfairness as to make the resulting conviction a denial of due process.'"[100]  It is uncontested that the jury instructions given by the trial court properly defined the beyond a reasonable doubt standard.  This court, as did the California Court of Appeals, must assume in the absence of evidence to the contrary that the jury followed the instructions given by the trial court.[101]  "'The jury is regularly presumed to accept the law as stated by the court, not as stated by counsel.'"[102]  This presumption has not been overcome in this case as there is no evidence that the jury was confused about the proof beyond a reasonable doubt standard.  The jury never sought clarification of the standard and, as the California Court of Appeal noted, all three defense counsel stressed the reasonable doubt standard in their closing arguments.[103]

On the record before it, this court cannot say that the decision of the California Court of Appeal was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[104]  Nor can this court find that the state court unreasonably applied the correct legal principle to the facts of Keomanivong's case within the scope of *Andrade-Williams-Schriro*. Keomanivong is not entitled to relief under his ninth ground.

---

[100] *Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2004), quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

[101] *See Weeks*, 528 U.S. at 234; *Richardson,* 481 U.S. at 206; *Francis*, 471 U.S. at 324 n. 9.

[102] *United States v. Medina Casteneda*, 511 F.3d 1246, 1250 (9th Cir. 2008) (quoting *United States v. Rodrigues*, 159 F.3d 439, 451 (9th Cir. 1998).

[103] *See id.*

[104] 28 U.S.C. § 2254(d).

## V.  CONCLUSION AND ORDER

Keomanivong is not entitled to relief under any grounds presented to this court.

Accordingly,

**IT IS ORDERED THAT** the Petition for a writ of habeas corpus under 28 U.S.C.

§ 2254 is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of

Appealability.[105]  Any further request for a Certificate of Appealability must be addressed to the

Court of Appeals.[106]

The Clerk of Court will please final judgment accordingly.

Dated: March 8, 2010.

      /s/ John W. Sedwick

JOHN W. SEDWICK
United States District Judge

---

[105] 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (a COA should be granted where the applicant has made "a substantial showing of the denial of a constitutional right," *i.e.,* when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.") (internal quotation marks and citations omitted).

[106]*See* Fed. R. App. P. 22(b); Ninth Circuit R. 22-1.